**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

```
* * * * * * * * * * * * * * * * * * * * * * * * * *
TRANSCHED SYSTEMS LIMITED,          *
                                    *
           Plaintiff,               *
                                    *        C.A. No. 12-939-M-PAS
      v.                            *
                                    *
FEDERAL INSURANCE COMPANY,          *
                                    *
           Defendant.               *
* * * * * * * * * * * * * * * * * * * * * * * * *
```

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO**
**DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FED.R.CIV.PRO. 12(b)(6)**

Defendant Federal Insurance Company's Motion to Dismiss violates the basic rule that the facts in a Complaint must be accepted as true. Because the well-pleaded facts establish valid causes of action against Federal, the Motion to Dismiss should be denied.

**INTRODUCTION**

This "direct action" arises out of the purchase by Plaintiff TranSched Systems, Inc. ("TranSched") of software assets from three Rhode Island companies collectively known as "Versyss." During the due diligence process that preceded the transaction, a low-ranking officer of Versyss (Sheryl Miller, a Vice President) falsified documents and concealed information to mislead TranSched about the timetable for development of a key product. This "Wrongful Act" by Sheryl Miller fraudulently induced TranSched not only to spend money to further pursue the deal but also, ultimately, to buy the software assets.

When the fraud came to light, TranSched made a claim against Versyss, ultimately winning a jury trial in Delaware state court. The jury found Versyss liable on three grounds: (1) intentional misrepresentation, on account of Ms. Miller's fraudulent conduct during the due

diligence stage in Fall 2004; (2) breach of contract with respect to representations and warranties contained in an Asset Purchase Agreement ("APA") executed contemporaneously with the close of the transaction in January 2005; and (3) breach of the covenant of good faith and fair dealing. The jury awarded damages of $500,000, plus costs and interest. Versyss has failed to pay the judgment and is now defunct.

This direct action ensued against Versyss's insurer, Federal. Versyss had timely tendered TranSched's claim to Federal under a Directors and Officers Policy insuring against liability for "Wrongful Acts" chargeable to Versyss. Federal provided defense coverage to Versyss during the Delaware lawsuit. However, Federal now denies coverage under two exclusions:

-   First, Federal asserts that Ms. Miller's pre-contracting fraud is excluded by the Limited Contract Exclusion, which bars coverage for liability arising out of a breach of contract (unless the Insured Entity would have been liable even in the absence of the contract); and

-   Second, Federal asserts that coverage is excluded under the Deliberate Fraud Exclusion, which bars coverage for deliberately fraudulent acts committed by certain enumerated officers such as the CEO or CFO (**but** does not bar coverage for fraud committed by lower-tier officers such as Vice Presidents).

Although the substance of Federal's Motion far outstrips the review permitted on a Rule 12(b)(6) Motion, the facts pleaded in TranSched's Complaint in this case rebut both exclusions. With respect to the Limited Contract Exclusion, the jury in the underlying case found that Versyss's conduct not only constituted a breach of contract (i.e., a breach of the representations in the Asset Purchase Agreement ("APA")), but also constituted the separate tort of intentional misrepresentation. This finding was based on conduct that occurred months prior to execution of the APA, and the conduct was actionable without regard to anything contained in the APA. Because the jury found the fraud during the due diligence stage to be a separately actionable tort arising out of different facts, Versyss would have been liable even if the transaction had closed

2

without the APA (or any of its representations) having been made (or even if the transaction had never closed, because the fraud induced TranSched to continue to spend resources pursuing the transaction).[1]

With respect to the Deliberate Fraud Exclusion, TranSched alleged in the Complaint (and proved in the underlying trial) that Ms. Miller falsified documents to misrepresent the date when Versyss's key product would be ready for the market, thus fraudulently inducing TranSched to acquire Versyss. Because fraud by low-ranking officers like Ms. Miller is not imputable to Versyss, the Deliberate Fraud Exclusion does not apply.

Finally, Federal's attempt to dismiss the additional counts should be denied. With respect to Count II (TranSched's claim under the "rejected settlement offer" statute, R.I. Gen. Laws 1956 § 27-7-2.2), Federal makes no argument in support of dismissal, nor could it reasonably do so. The statute expressly gives standing to plaintiffs in TranSched's position to seek all interest due on the judgment even if it exceeds policy limits; and the Complaint alleges that a pretrial settlement offer within policy limits was rejected by Federal, thus triggering "strict liability" under the statute. See Demarco v. Travelers Ins. Co., 26 A.3d 585, 616 (R.I. 2011).

With respect to the statutory and common law bad faith claims, Federal misapprehends the nature of relief available to and sought by TranSched. TranSched seeks only to stand in the shoes of Federal's insured, Versyss, and to assert only the bad faith claims available to Versyss.

Accordingly, and as stated more fully herein, the Motion to Dismiss should be denied.

---

[1] As will be discussed, Federal conflates the **transaction** with the **Asset Purchase Agreement**. Federal fails to recognize that the event is distinct from the documentation of the event. Purchase-and-sale transactions can and do occur in the absence of a formal written agreement as well as in the absence of representations and warranties. If (as the Limited Contract exclusion requires) one assumes hypothetically that the APA itself did not exist, this is not the same as assuming that the underlying event – the acquisition of Versyss by TranSched – also did not occur. Thus, even if the acquisition had occurred in the absence of the APA, the pre-contractual intentional misrepresentations by Ms. Miller would (and indeed, the jury found that it did) impose liability on Versyss, thus satisfying the exception set forth in the Limited Contract Exclusion.

# I. FACTUAL BACKGROUND

For purposes of this motion, the Court must "accept the well-pleaded facts as true, viewing factual allegations in the light most favorable to the plaintiff." Rederford v. U.S. Airways, Inc., 589 F.3d 30, 35 (1st Cir. 2009).

## A. The Underlying Transaction

In early February 2005, Plaintiff TranSched Systems, Inc. ("TranSched") acquired various transportation software assets belonging to Versyss Transit Solutions, LLC, Versyss Commercial Systems, LLC, and Holbrook Systems, Inc. (collectively "Versyss"). See Complaint at ¶ 9. To document this transaction, TranSched and Versyss entered into an Asset Purchase Agreement ("APA"), which signed on January 28, 2005 and had an effective date of February 1, 2005. See id. at ¶¶ 9-11.

The actual transaction itself was effectuated by a series of documents – a Bill of Sale, a General Conveyance, an Intellectual Property Assignment, an Assignment and Assumption Agreement, and a Receipt – that actually transferred ownership of the assets from Versyss to TranSched. See Exh. E-H.[2] In other words, the act of purchasing and selling the assets occurred outside the four corners of the APA.

## B. The Wrongful Act – Sheryl Miller's Fraud

Negotiations for this transaction commenced during the fall of 2004. During these negotiations, Sheryl Miller, a Vice President of Versyss, made numerous material misrepresentations to TranSched, upon which TranSched relied to its detriment. See Complaint at ¶¶ 9-10. Relying upon these pre-contractual intentional misrepresentations, TranSched continued with its due diligence process and ultimately went forward with the transaction. Id.

---

[2] To avoid confusion, TranSched has marked its exhibits beginning with the letter "E," as Federal's exhibits ended with the letter "D."

### C.  Federal Accepts Coverage of the Underlying Action

On August 31, 2007, TranSched filed a lawsuit (the "Underlying Action") in the Superior Court of Delaware, New Castle County, against the Versyss entities as well as their principal shareholder, Henry W. Holbrook. See Complaint at ¶ 6.   Versyss tendered the lawsuit to Federal for defense and indemnity. See Complaint at ¶ 20.  Federal retained counsel to defend Versyss in the Underlying Action. See id. at ¶ 20.

When Federal agreed to defend under a reservation of rights, the complaint in the Underlying Action alleged intentional misrepresentation based on the pre-contractual misrepresentations of Ms. Miller. See id. at ¶¶ 9-10.  Even though Federal was aware of the Limited Contract Exclusion and the Deliberate Fraud Exclusion in its Policy, Federal determined that the misrepresentations of Ms. Miller, as alleged in the Underlying Action, created a possibility of coverage, thereby triggering its duty to defend.  See id. at ¶¶ 8-10, 20.

### D.  The Underlying Trial and Verdict

The evidence at trial established that Ms. Miller provided TranSched with a false project plan for the Titan transportation software, stating that the software would be ready for beta testing within three months of closing, even though other Versyss employees testified that there was "virtually no code or specifications written for Titan" as of the date of closing, let alone as of the date Ms. Miller made the statements.  See Exh. I (TranSched's Opp. to Motion for Judgment) at 3.  The evidence "also showed that Ms. Miller intentionally deceived TranSched by concealing her awareness of numerous Titan customers' dissatisfaction with Versyss and her awareness that key customers were on the verge of abandoning the project."  Id. at 2-3. TranSched's CEO, Steve Sadler, testified that had it known the truth about the state of Titan's

development, TranSched would have walked away from the transaction.  See Exh. J

(TranSched's Opposition to Versyss's Motion to file Supp. Br.) at 2-3.[3]

On January 21, 2011, the jury found the Versyss entities jointly and severally liable under

three different counts: (1) intentional misrepresentations, (2) breach of the APA, and (3) breach

of the implied covenant of good faith and fair dealing. See Complaint at ¶ 12; Complaint Exh. A

(Jury Verdict Form).  The jury made a single damages award of $500,000 to TranSched.

Complaint at ¶ 13; Complaint Exh. A (Jury Verdict Form).  On August 17, 2011, Judge William

C. Carpenter, Jr. ruled that, in addition to the $500,000 damages award, TranSched was entitled

to $19,874.25 in costs, $170,268.75 in prejudgment interest, and post-judgment interest at a rate

of $154.11 per diem. Complaint at ¶ 14; Complaint Exh. B (August 17, 2011 Opinion) at 16.

On January 24, 2012, final judgment entered in the Underlying Action. There are no

appeals pending in the Underlying Action, and all relevant appeals periods have now expired.

Complaint at ¶ 15.

### E.  The Insurance Policy

#### a.  Basic Grant of Coverage

Pursuant to Policy No. 8159-5652 (the "Policy"), Federal provided claims-made coverage

to all of the Versyss entities for claims made during the policy period (April 26, 2005-2006). See

Complaint at ¶¶ 16, 19.  The specific coverages purchased by Versyss included so-called

"Corporate Liability Coverage" under the "Directors & Officers Liability Coverage Section"

("D&O Section") of the Policy, which provides:

---

[3]     Much of the evidence at trial was submitted under seal and is not publicly available.  As set forth in the
        affidavit of Rickey G. Glover, TranSched has initiated the process of seeking Versyss's assent to relief
        from the protective order in effect in Delaware.  If such consent is not forthcoming, TranSched will move
        the Delaware court for relief.

(C)     **Corporate Liability Coverage (Optional)**

If the Corporate Liability Coverage is purchased as set forth in Item 3 of the Declarations of this Coverage Section, [Federal] shall pay **Loss** on behalf of the **Insured Organization** resulting from any **Insured Organization Claim** first made against such **Insured Organization** during the **Policy Period**, or any applicable Extended Reporting Period, for **Wrongful Acts**."

Id. at ¶ 21 (emphasis in original). The Policy contained several relevant definitions:

- "**Loss**" was defined in D&O Section as "the total amount which any **Insured** becomes legally obligated to pay as a result of any **Claim** made against any **Insured** for **Wrongful Acts**, including, but not limited to, damages…., judgments, settlements, pre-judgment and post-judgment interest and **Defense Costs**." Id. at ¶ 22 (emphasis in original).

- An "**Insured Organization Claim**" was defined in the D&O Section to include "(a) a written demand for monetary damages or non-monetary relief; or (b) a civil proceeding commenced by the service of a complaint or similar pleading…against an **Insured Organization** for a **Wrongful Act**." Id. at ¶ 23 (emphasis in original).

- Additionally, the General Terms and Conditions Section defined **Insured Organization** as "the **Parent Corporation** and any **Subsidiary** created at any time….**Insured Organization** shall also mean any such entity as a **Debtor in Possession** or an equivalent status under the law of any other country." Complaint at ¶ 24 (emphasis in original).

- Finally, the D&O Section defined Wrongful Act to include misleading statements and omissions, as well as breaches of duty committed by any Insured Organizations:
  (U)     **Wrongful Act** means:
          (1)     any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted by:
          …
          (b)     For purposes of coverage under Insuring Clause (C):  any **Insured Organization…**"

Complaint at ¶ 25 (emphasis in original).

### b. **Relevant Exclusions**

In its Motion to Dismiss, Federal advances two exclusions. First, Federal relies on

exclusion (C)(2) (the "Limited Contract Exclusion"), which provides:

> (C)    No coverage will be available under Insuring Clause (C) for any
> Insured Organization Claim:
> …
>> (2)    based upon, arising from, or in consequence of any actual
>> or alleged liability of an Insured Organization under any
>> written or oral contract or agreement, provided that this
>> Exclusion (C)(2) shall not apply to the extent that an
>> Insured Organization would have been liable in the absence
>> of the contract or agreement.

Federal Exh. C, Federal Policy at Excerpt at 8.  The Limited Contract Exclusion excludes

coverage for liability arising out of a breach of contract; but the second part of the exclusion (the

"Reinstatement Clause") reinstates coverage if liability would have attached "in the absence of

the contract or agreement."  Notably, the Reinstatement Clause is focused on the hypothetical

absence of the "contract or agreement," ***not*** the theoretical absence of the transaction itself.

Second, Federal relies on Exclusion A(10) (the "Deliberate Fraud Exclusion"), which

excludes coverage "based upon, arising from, or in consequence of any deliberately fraudulent

act or omission" by "such Insured." Federal Exh. C, Federal Policy Excerpt at 6, 8.  By using the

term "such Insured," the Exclusion is focused upon deliberate fraud committed by the particular

Insured that is seeking coverage.  This language is reinforced by the "Severability of Exclusions"

clause, which provides that

> Only facts pertaining to and knowledge possessed by any past, present or
> future Chief Financial Officer, President, Chief Executive Officer or
> Chairperson of any Insured Organization shall be imputed to any Insured
> Organization to determine if coverage is available.

Id. at 9.  Thus, when determining whether an Insured Organization such as the Versyss entity has

committed "a deliberately fraudulent act or omission" that would trigger the Deliberate Fraud

Exclusion, the Severability of Exclusions clause provides that the only deliberately fraudulent acts and omissions to be imputed to the Versyss entities are those committed by specified officers (CFO, President, CEO, Chairperson), but not those committed by Vice Presidents.

## II.    LEGAL STANDARDS

### A.  Standard on Motion to Dismiss

A complaint "must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft</u> v. <u>Iqbal</u>, 556 U.S. 662, 667, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting <u>Bell Atl. Corp.</u> v. <u>Twombly</u>, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  Courts do not construe <u>Iqbal</u> to require detailed evidentiary pleading. Rather, the Court's charge is to consider, in light of applicable substantive law, whether a plausible case is made out.  This means a Plaintiff must only present "factual allegations that raise a right to relief above the speculative level." <u>W. Reserve Life Assur. Co. of Ohio</u> v. <u>Conreal LLC</u>, 715 F. Supp. 2d 270, 275 (D.R.I. 2010) (quoting <u>Simmons</u> v. <u>Galvin</u>, 575 F.3d 24, 30 (1st Cir. 2009) (citation and internal quotation marks omitted)).  In judging whether this standard is satisfied, the Court may consider not only the Complaints, but "facts extractable from documentation annexed to or incorporated by reference in the complaint and matters susceptible to judicial notice."  <u>Jorge</u> v. <u>Rumsfeld</u>, 404 F.3d 556, 559 (1st Cir. 2005).

### B.  Rhode Island Standard for Interpreting Insurance Contracts

It is well settled in Rhode Island that a court "applies the rules for construction of contracts when interpreting an insurance policy." <u>Sjogren</u> v. <u>Metropolitan Property and Casualty Ins. Co.</u>, 703 A.2d 608,610 (R.I. 1997); <u>see also</u> <u>Mallane</u> v. <u>Holyoke Mutual Ins. Co. in Salem</u>, 658 A.2d 18, 19-20 (R.I. 1995).  The language of an insurance policy must be viewed in its entirety, and given its "plain, ordinary and usual meaning." <u>Amica Mutual Ins. Co.</u> v. <u>Streicker</u>,

583 A.2d 550, 552 (R.I. 1990); <u>see also</u> <u>Bartlett</u> v. <u>Amica Mutual Ins. Co.</u>, 593 A.2d 45,48 (R.I. 1991) ("the language of insurance policies is to be interpreted in accordance with the way it would be understood by the average man, rather than in a technical sense."). When an insurance policy is "ambiguous or capable of more than one reasonable meaning, the contract will be strictly construed in favor of the insured and against the insurer." <u>Bartlett</u>, 593 A.2d at 47. "Ambiguous exclusionary clauses, particularly, should be construed in the manner most favorable to the insured." <u>Id</u>. at 48.

## III. ARGUMENT

### A. As a Matter of Law, Federal's Defense of the Underlying Action Under a Reservation of Rights Warrants Denial of its Current Motion to Dismiss Count I

The Motion to Dismiss Count I can be disposed of by reviewing Federal's conduct in the Underlying Action. After agreeing that the allegations of the Underlying Complaint required Federal to defend its Insureds—and spending over a million dollars doing so—Federal now argues that these same claims could not possibly be covered under the Policy. These positions are irreconcilable.

Under Rhode Island law, an insurer's duty to defend arises only if the underlying complaint alleges facts "bringing the case potentially within" the coverage of the policy:

> [The duty to defend hinges] on whether the complaint in the underlying tort action alleges facts and circumstances bringing the case within the coverage afforded by the policy. That question is resolved by comparing the complaint in that action with the policy issued by the insurer; if the complaint discloses a statement of facts bringing the case *potentially within* the risk coverage of the policy the insurer will be duty-bound to defend irrespective of whether the plaintiffs in the tort action can or will ultimately prevail.

<u>Flori</u> v. <u>Allstate Ins. Co.</u>, 120 R.I. 511, 388 A.2d 25, 26 (1978) (emphasis added); <u>see</u> <u>also</u>

<u>Travelers Cas. & Sur. Co.</u> v. <u>Providence Washington Ins. Co., Inc.</u>, 685 F.3d 22, 25 (1st Cir.

2012) (same). In other words, if there is ***any possibility*** that the Underlying Complaint, if proven, could trigger an eventual duty to indemnify, only then must the insurer provide a defense.

Under Rule 12(b)(6), the standard for measuring a Motion to Dismiss in a coverage lawsuit asks a nearly identical question: Whether, on the facts alleged, there is any plausible set of facts that would trigger a duty to indemnify. <u>See</u>, <u>e.g.</u>, <u>W. Reserve Life Assur. Co. of Ohio</u> v. <u>Caramadre</u>, 847 F. Supp. 2d 329, 336 (D.R.I. 2012) (plaintiff must present "factual allegations that raise a right to relief above the speculative level."); <u>see also</u> <u>Quesnel</u> v. <u>Prudential Ins. Co.</u>, 66 F.3d 8, 10 (1st Cir. 1995) ("a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."); <u>see generally</u> , <u>Kachougian</u> v. <u>United States</u>, 96-508-T, 1999 WL 973533 (D.R.I. Sept. 10, 1999) (dismissal "should be granted '[o]nly if…the pleading shows no set of facts which could entitle [the] plaintiff to relief'") (quoting <u>Gooley</u> v. <u>Mobil Oil Corp.</u>, 851 F.2d 513, 514 (1st Cir. 1988)).

Federal makes no attempt to explain how the allegations of the Underlying Complaint raised a potential for indemnity coverage that was sufficient to trigger its duty to defend, yet are somehow insufficient under Rule 12(b)(6) to raise a "plausible" potential for indemnity coverage. The Underlying Complaint alleged Ms. Miller's pre-contractual misrepresentations and sued—in its first claim for relief—for intentional misrepresentation based on TranSched's reliance on them. <u>See</u> Underlying Complaint (Exh. B to Federal's MTD) at ¶¶ 16, 23-26, 46-54, and 72-76. Federal applied the universal duty-to-defend rule to these allegations and (correctly) defended the lawsuit because it decided the alleged facts plausibly stated covered claims.

Thus, while Federal expends great energy arguing that the allegations of the Underlying Complaint do not plausibly state a claim for coverage, this argument is conclusively rebutted by Federal's conduct in defending the same claims in the underlying case.

**B. The Facts Alleged in the Complaint, Taken as True, Establish that Coverage Exists Under the Federal Policy**

The Complaint in this case alleges facts establishing coverage under the Federal Policy and demonstrating the inapplicability of the Limited Contract and Deliberate Fraud exclusions.

**1.  Coverage Exists Under the Corporate Liability Coverage Section**

The Corporate Liability Coverage section grants coverage for "**Loss** on behalf of the **Insured Organization** resulting from any **Insured Organization Claim**[4] first made against such **Insured Organization** during the **Policy Period**…for **Wrongful Acts**." Complaint at ¶¶ 21 (emphasis is original).  In its Motion to Dismiss, Federal does not dispute that the Complaint sets forth a prima facie case of coverage, nor could it reasonably do so.

First, by setting forth the monetary judgment entered against Versyss by the Delaware court, the Complaint alleges "Loss," which is defined in the Policy defines as "the total amount which any **Insured** becomes legally obligated to pay as a result of any **Claim** made against any **Insured** for **Wrongful Acts**." See Complaint at ¶ 12-18, 22.   Nor is it disputed that the claim was first made against Versyss during the policy period. See id. at ¶ 20.  Finally, the Complaint – by setting forth "misstatements" and "misleading conduct" as the cause of the Loss – clearly alleges that the Loss arose out of a "Wrongful Act," which the Policy defines to include misstatements made by, misleading statements made by, and breaches of duties owed by any Insured Organization (i.e., the Versyss entities). See id. at ¶ 25.  Because the Complaint

---

[4]     The Federal Policy defines "Insured Organization Claim" to include "(b) a civil proceeding commenced by the service of a complaint or similar pleading…against an **Insured Organization** for a **Wrongful Act**." Complaint at ¶ 23.  It is undisputed that the Underlying Complaint is a complaint against the Versyss entities, each of which are Insured Organizations under the policy.

expressly alleges (and Federal does not dispute) that the jury found the Versyss entities liable, jointly and severally, for "engage[ing] in intentional misrepresentation," see id. at ¶ 12; see also Complaint Exh. A (Jury Verdict Form) – a *prima facie* case of coverage has been pled.

## 2.     The Limited Contract Exclusion Does Not Bar Coverage

The burden of proof now shifts to Federal to establish that, as a matter of law, there are no sets of facts that could bring this case outside the scope of coverage. See  Hauser v. Stonebridge Life Ins. Co., CA 10-423 S, 2012 WL 1941576 (D.R.I. Mar. 5, 2012) ("[T]he insured seeking to establish coverage bears the burden of proving a prima facie case that coverage exists …. The burden then shifts to the insurer to prove the applicability of policy exclusions and limitations in order to avoid an adverse judgment."), *report and recommendation adopted*, CA 10-423 S, 2012 WL 1936682 (D.R.I. May 29, 2012) (quoting Gen. Accident Ins. Co. of Am. v. Am. Nat'l Fireproofing, Inc., 716 A.2d 751, 757 (R.I. 1998)).  Federal  has not made this showing.

Federal first relies on the Limited Contract Exclusion, which provides as follows:

(C)     No coverage will be available under Insuring Clause (C) for any Insured Organization Claim:
…
(2)     based upon, arising from, or in consequence of any actual or alleged *liability* of an Insured Organization under any written or oral contract or agreement, provided that this Exclusion (C)(2) *shall not apply to the extent that an Insured Organization would have been liable in the absence of the contract or agreement*.

Federal Exh. C at 8 (emphasis added).  To prevail under this exclusion, Federal must prove two things: (1) that Versyss's liability for intentional misrepresentation is solely "based upon, arising from, or in consequence of any actual or alleged liability under any written or contract;"  and (2) if so, that Versyss "would have been liable in the absence of the contract."  As will be seen, Federal misstates (and therefore misanalyses) the first test, by ignoring the word "liability" and it

essentially disregards the Reinstatement Clause by failing to ask whether Versyss would have been liable even in the absence of the APA.

Federal's attempt to meet the first test is crystallized in its statement that "TranSched's intentional misrepresentation claim **arose from the APA**." See Federal Memo at 10 (emphasis added). The balance of its argument flows from this assertion. However, Federal has misstated the policy language and therefore has undertaken the wrong analysis. For the exclusion to apply, Federal must establish that all of Versyss's liability for intentional misrepresentation is "based upon, aris[es] from, or [is] in consequence of [Versyss's] **liability** under the [APA]." In other words, Versyss's liability for Sheryl Miller's intentional misrepresentations in Fall 2004 must be shown to arise not from the APA but from Versyss's **liability** for breach of the separate representations and warranties that it made in the APA several months later, in January 2005.[5]

---

[5] Federal is not the first insurer to elide the distinction between "arising from **liability** under a contract" and "arising from a contract":

> National Union also argues that Count Two alleges a breach of contract claim and is precluded from coverage by exclusion 4(k), which bars claims "alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of an Insured under any express contract or agreement." (Ex. E to Zoller Decl. 7.) National Union's contentions, however, broaden the scope of this exclusion beyond its plain and ordinary meaning. The policy states that it does not cover a claim alleging, arising out of, based upon, or attributable to any actual or alleged contractual *liability,* whereas National Union reads the provision as precluding any claims based upon or attributable to any actual or alleged *contract.* It attempts to cabin Count Two as a claim that falls under exclusion 4(k), asserting that Food King has brought a breach of contract action because Count Two alleges the following:
>
> > On November 27, 2001, Food King and Manyfoods reached an agreement in principle to purchase the Cedar Knolls Store on the same terms and conditions as the WAL Letter of Intent ... Instead of following through on its agreement, and in derogation of the By-Laws of Foodtown, Manyfoods ignored the Asset Purchase Agreement, ignored the letters of intent dated August 13 & 16, 2001, and entered into a new agreement with WAL.
>
> (Food King Am. Compl. 27-28.) But the mere mention of a contract does create a claim alleging, arising out of, based upon or attributable to any actual or alleged contractual liability.

Foodtown, Inc. v. National Union Fire Ins. Co., 2008 WL 3887616 *5-6 (D. N.J. Aug. 20, 2008) , *aff'd*, 412 Fed. Appx. 502, 506 (3rd Cir. 2011) ("As the District Court correctly pointed out, however, the plain language of the policy provides an exception from coverage only for claims 'alleging, arising out of, based upon or attributable to an alleged or actual contractual **liability** of an Insured.'") (emphasis added by Court of Appeals).

Federal has not attempted to make this showing, nor could it. Ms. Miller's fraudulent conduct was complete months before the APA came into existence, so it was factually impossible that such misrepresentations could have been "based upon" or could have "arose from" or could have been "in consequence of" the liability incurred by Versyss for events that had not yet happened. See McPeek v. Travelers Cas. & Sur. Co., 2006 WL 1308087, *4 (W.D. Pa. May 10, 2006) (fraudulent misrepresentation claims not barred by contract exclusion because "[t]he tortious conduct … *preceded* the purchase of the notes by the [underlying] plaintiffs, and the purchase of the notes was allegedly induced by and *followed* the tortious conduct") (emphasis in original). Moreover, her misrepresentations were not dependent on the subsequent events that gave rise to Versyss's liability for breach of contract, because even if the APA had not contained the representations and warranties that gave rise to the jury findings of breach of contract and breach of the covenant of good faith and fair dealing, Versyss still would have been liable for the intentional misrepresentations that caused TranSched to buy the software assets. Thus, the first prong of the Limited Contract Exclusion has not been satisfied.

Federal also fails to meet the second prong, pursuant to which it has the burden of proving under the Reinstatement Clause that Versyss would not have been liable for intentional misrepresentation under a hypothetical situation where the APA itself did not exist. Under the Reinstatement Clause, the exclusion is inapplicable "to the extent that an Insured Organization would have been liable in the absence of the contract or agreement." Federal Exh. C at 8. Importantly, under the policy language, the APA is the only thing that must be assumed not to

exist. The insurer is not permitted to assume that the underlying transaction itself – that is, the purchase by TranSched of software and other assets – did not occur.[6]

Thus, for purposes of this case, the question posed by the Reinstatement Clause is as follows: "Would Versyss have been liable if TranSched's purchase of assets had occurred in the absence of the APA itself?" The answer, plainly, is "yes." The jury not only found that Versyss was liable for breach of the APA but also found liability for "intentional misrepresentation." These misrepresentations were perpetrated by Sheryl Miller in the fall of 2004, months before the APA ever came into existence. In the hypothetical situation where the transaction took place without the representations and warranties set forth in the APA, the misrepresentations by Ms. Miller during the "due diligence" stage would still be actionable, because they still would have fraudulently induced TranSched to purchase the Versyss assets.

All that is needed for a successful transaction is an exchange of consideration, something that indisputably occurred in this case, as documented by the a series of documents –the Bill of Sale, the General Conveyance, the Intellectual Property Assignment, the Assignment and Assumption Agreement, and the Receipt – that actually transferred ownership of the assets from Versyss to TranSched. See TranSched Exhs. E - H. The APA contained additional representations and warranties that, upon being shown to be incorrect, provided an independent basis for liability that grew out of the APA itself rather than out of the pre-transactional fraud. But in the hypothetical absence of the APA, the pre-transactional fraud would remain actionable.

---

[6]     Black's Law Dictionary delineates the difference between (A) a "transaction" and (B) a "contract" that memorializes the terms of the transaction:

> **Contract,** n. **1.** An agreement between two or more parties, creating obligations that are enforceable or otherwise recognized at law …; **2.** The writing that sets forth such an agreement …; **3.** A promise or set of promises *by a party to a transaction*, enforceable or otherwise recognizable at law; the writing expressing that promise or set of promises….

Black's Law Dictionary (8th Ed.) at 341.

Federal pointedly fails to consider the Reinstatement Clause or to analyze whether Versyss would have been liable in the hypothetical absence of the APA. Instead, Federal finesses the issue by mischaracterizing the alleged misrepresentations as being solely those arising from the APA representations and warranties, rather than Ms. Miller's deceit and concealment during the due diligence process, several months before the APA was signed. <u>See</u>, <u>e.g.</u>, Federal Memo. at 11 ("TranSched specifically alleged that material misrepresentations were contained in the APA itself.").[7] Federal ignores the established fact that TranSched alleged and proved two different categories of Wrongful Acts, the first category triggering contract liability and the second category triggering tort liability. The first category consisted of contract-based theories and relied upon proof that representations and warranties in the APA itself proved to be untrue, thus breaching both the APA itself and the covenant of good faith and fair dealing.

If this was the only basis for liability, then the Limited Contract Exclusion might have relevance. But as Federal points out in its brief, "[a] court must consider the facts alleged, rather than the legal theories asserted, when determining whether a claim falls within the scope of a liability policy's contract exclusion." Federal Memo. at 11, *citing* <u>Carolina Cas. Ins. Co.</u> v. <u>Sowell.</u>, 603 F. Supp. 2d 914, 928 (N.D. Tex. 2009).[8] And the facts alleged both in the Complaint in this case and in the Underlying Action demonstrate that TranSched also proved a *second* category of Wrongful Acts, one that preceded the APA by several months and that was

---

[7] For example, Federal devotes a page of its brief to recitations of APA representations that proved to be inaccurate. <u>See</u> Federal Memo. at 10-11. Federal misses the point, which is to ask whether there would be liability in the absence of the APA's representations and warranties. Because Ms. Miller's pre-contractual misrepresentations are independently actionable, Versyss would still be liable even if the APA representations and warranties had never been made.

[8] This general principle – that a court looks to the facts rather than legal theories when determining coverage – does not mean that the asserted legal theory is irrelevant. The Limited Contract Exclusion requires Federal to prove that coverage for the intentional misrepresentation claim arises from Versyss's "*liability* under" the APA. Because the exclusion is tied not to the contact itself but to Versyss's liability under the contract, the "facts" relevant to the analysis of the Limited Contract Exclusion necessarily include the legal theories of liability that underlie both the "intentional misrepresentation" claim and the "breach" claims.

focused on misrepresentations outside the APA that would have been actionable even in the hypothetical absence of the APA and the hypothetical absence of the representations and warranties therein. Because the intentional misrepresentation claims would survive even if there had never been an APA, the Reinstatement Clause provides coverage.

This result is consistent with substantial precedent examining the Reinstatement Clause. For example, in America's Collectibles Network, Inc. v. Chase Paymentech Solutions, LLC, 3:07-CV-278, 2008 WL 4546251, at *14 (E.D. Tenn. Sept. 24, 2008), Federal sought dismissal based on the identical Limited Contract exclusion by arguing, as it does here, that an agreement between the underlying plaintiff and defendant "was at the heart of the dispute." Id. The court held that because the complaint against Federal contained allegations that "arguably" indicated that the Insured "'would have been liable in the absence of the contract or agreement,' as provided by the exception to the exclusion," dismissal was inappropriate. See id. See also, e.g., Foodtown, Inc., *supra*, 2008 WL 3887617 , *5-6 (finding coverage for breach of fiduciary duty claims for tortious conduct outside the contract); America's Collectibles Network, Inc. v. Chase Paymentech Solutions, LLC, 2008 WL 4546251 *14 (denying Federal's 12(b)(6) motion where tort claims based on "'unauthorized transactions, either by error or omission or though neglect' indicate that Plaintiff ACN 'would have been liable in the **absence** of the **contract** or agreement,' as provided by the exception to the [Limited Contract Exclusion]") (emphasis in original).[9]

---

[9]     A useful analysis is set forth in American Guar. & Liab. Ins. Co. v. Fojanini, 90 F.Supp.2d 615, 622-23 (E.D. Pa. 2000), in which the insurer argued that the underlying claim of fraudulent representations during the pre-contractual negotiating period were essentially contract-based, not tort-based. The District Court rejected this argument, holding that "if the complaint essentially alleges a breach of duties that flow from an agreement between the parties, the action is contractual in nature, whereas if the duties allegedly breached were of a type imposed on members of society as a matter of social policy, the action is essentially tort-based." Id. In this case, the misrepresentations by Sheryl Miller did not represent a breach of duty created by a contract, because no contract existed at the time of the wrongful conduct. Rather, her misrepresentations violated a duty "of a type imposed on members of society as a matter of social policy,"

The court in <u>Harker's Distribution, Inc.</u> v. <u>Federal Ins. Co.</u>, 08-CV-4105-DEO, 2009 WL 3199533 (N.D. Iowa Sept. 30, 2009), went even further, holding in its denial of Federal's motion to dismiss that the identical Limited Contract Exclusion would not apply even when the only claim made by the underlying plaintiff was for breach of contract.  In <u>Harker's</u>, the plaintiff argued that the application of the exception to the "Contract" exclusion "turns not on the question of whether [the underlying plaintiff] sued under non-contractual theories, but instead asks if he **could have** and, if he did, whether [the Insured] *'would have* been liable' under those theories." <u>Id</u>. at *5 (emphasis in original). The court in <u>Harker's</u> agreed, holding that "the exception to the Contractual Liability Exclusion required Federal to consider whether McMillan could have asserted a claim against Harker's for its wrongful acts under a legal theory independent of any contract, and if so, whether Harker's would have been liable to McMillan under that theory. <u>See</u> <u>id</u>.

In this case, the Court need not go as far as <u>Harker's</u>, because TranSched in fact alleged, proved and obtained a jury verdict establishing a basis for tort liability that would survive even in the hypothetical instance in which the transaction occurred in the absence of the APA and its representations and warranties.  Accordingly, the Limited Contract Exclusion does not apply.

There is an additional reason why Federal's reliance on the Limited Contract Exclusion must be rejected.  As discussed in Section III.C., *infra* at 22-24, the principal evidentiary support for Federal's argument is found not in the one document that controls this motion (<u>i.e.</u>, the Complaint in *this* case).  Instead, Federal relies on extraneous documents, principally the allegations of the Underlying Complaint.  Federal selectively parses that document to argue that TranSched has not stated a plausible case for coverage.  However, Federal ignores those

---

namely, the duty to refrain from fraudulent conduct that induces other people to change their position to their detriment and to the benefit of the perpetrator.

allegations both in the Complaint in this case and in the Underlying Complaint alleging

Wrongful Acts preceding, and independent from, the representations and warranties in the APA

that were the basis of the breach-of-contract claim.  See Complaint at ¶¶ 9-11; Exh. B

(Underlying Complaint) at ¶¶ 16, 23-26, 46-54.

Straying even further outside the four corners of the Complaint in this case, Federal

cherry-picks sections of the trial judge's ruling on post-trial motions in support of its argument

that the jury's finding of liability based on intentional misrepresentation was redundant of its

finding of a breach of contract.  Federal ignores, however, other rulings by the trial judge that

liability for misrepresentations during the due diligence phase would have attached without

regard to either the representations and warranties made (or not made) in the APA or any

integration or exculpatory provisions in that same document.[10]   In other words, if the seller

engages in pre-contractual misrepresentations that induce the buyer to make the deal, the seller

cannot use a purchase-and-sale agreement to contract its way out of liability for fraud. See, e.g.,

Airborne Health, Inc. v. Squid Soap, LP, 984 A.2d 126, 136-37 (Del. Ch. 2009) ("Because of

Delaware's strong public policy against intentional fraud, a knowingly false contractual

representation can form the basis for a fraud claim, regardless of the degree to which the

agreement purports to disclaim or eliminate tort remedies."); Travers v. Spidell, 682 A.2d 471,

---

[10]     As stated by Judge Carpenter:

> "The Court wants to be clear that the Opinion does not reflect a belief by the Court that contractual provisions such as the ones at issue here would insulate or protect a party whose conduct would be fraudulent in nature.  In spite of due diligence by sophisticated parties, the Court can never be in a position to condone or prevent redress for clearly fraudulent activity. The interaction between contacting parties must be done in good faith by parties whose conduct meets reasonable business and ethical standards and not one masterminded with an evil intent to fraudulently mislead the other party."

Memorandum Opinion, dated April 2, 2008., attached hereto as Exh. K.

473 (R.I. 1996) ("general merger and disclaimer language" used in a contract does not, as a matter of law, bar a fraud claim).

In any event (and as discussed in detail in Section III.A., *supra*), there is substantial evidence establishing Ms. Miller's pre-contractual fraud; and in the context of a Rule 12(b)(6) motion, Federal's reliance on facts outside the Complaint compels denial of the Motion.

### 3. The Deliberate Fraud Exclusion Does Not Bar Coverage

Finally, Federal relies upon the Deliberate Fraud Exclusion. This argument is similarly without merit.

As an initial matter, Federal's decision to defend the underlying case under a reservation of rights is an evidentiary admission that the Underlying Complaint alleged facts sufficient to create a possibility of indemnity, notwithstanding the Deliberate Fraud Exclusion. Federal does not explain why that same potential for indemnity has suddenly disappeared.

More importantly, an application of the facts in the Complaint to the Policy's plain language shows that the Deliberate Fraud Exclusion does not apply. That exclusion bars coverage for liability "based upon, arising from, or in consequence of any ***deliberately*** fraudulent act or omission" by "***such*** Insured." Federal Exh. C at 8 (emphasis added).[11] Thus, the Versyss entities (which are Insured Organizations) are subject to the Deliberate Fraud Exclusion only if "such Insureds" committed a "deliberately" fraudulent act. "Deliberateness" is a state of mind, and an organization (unlike a person) does not have its own "state of mind." Thus, the question becomes: How does one determine the Versyss entities' state of mind?

---

[11] The Policy's use of the term "such Insured" – as opposed to "any insured" or "an insured" –establishes that the fraud of one Insured will not automatically result in a denial of coverage if other Insured Entities are held liable for such fraud in which they did not participate. See <u>Dolcy</u> v. <u>Rhode Island Joint Reinsurance Assoc.</u>, 589 A.2d 313, 315, n. 1 (R.I. 1991) (where exclusion is triggered by fraud committed by "***an*** insured" rather than "***such*** Insured," exclusion applies even to innocent co-insured").

The answer is provided in the "Severability of Exclusions" clause (Policy Section III.D), which provides:

> Only facts pertaining to and knowledge possessed by any past, present or future Chief Financial Officer, President, Chief Executive Officer or Chairperson of any Insured Organization shall be imputed to any Insured Organization to determine if coverage is available.

Federal Exh. C at 9. Thus, Versyss's "state of mind" consists solely of the "facts pertaining to and knowledge possessed by" Versyss's CFO, President, CEO or Chairperson. More to the point, the facts pertaining to and knowledge possessed by Vice Presidents or Chief Technology Officers are ***not*** imputed to Versyss and cannot trigger the Deliberate Fraud Exclusion.[12]

That is outcome-determinative on this motion. The Complaint plainly alleges that the intentional misrepresentations were committed by Sheryl Miller, a Vice President at Versyss, and Lorin Miller, Chief Technology Officer of Versyss. See Complaint at ¶ 10.[13] Because neither Sheryl Miller nor Lorin Miller held the position of CFO, President, CEO, or chairperson of any Versyss entity, the facts pertaining to, and the knowledge held by, these officers cannot be imputed to Versyss. Accordingly, the Deliberate Fraud Exclusion is inapplicable.

## C. Because Federal's Motion Relies Heavily on Material Extraneous to the Four Corners of the Complaint, the Court Should Strike Such Material

TranSched's Complaint alleges facts which, accepted as true for the purposes of this motion, are sufficient to establish coverage under the Policy. This should be the end of the inquiry at this early stage of the case.

---

[12] By comparison, in a case that did apply Federal's Deliberate Fraud Exclusion, coverage, was denied due to the fraud of the insured's CEO. See, Herley Indus., Inc. v. Fed. Ins. Companies, Inc., CIV.A.08-5377, 2009 WL 2596072 (E.D. Pa. Aug. 21, 2009) (no coverage due to CEO's fraudulent inflation of prices).

[13] Further (and as discussed supra at Section III.A.), the evidence upon which the jury found Versyss liable for intentional misrepresentations arose from the acts, omissions, and knowledge of Sheryl Miller concerning the readiness of the Titan software and the satisfaction of the Versyss customers with respect to the Titan program. See Exh. I (TranSched's Opposition to Versyss's Motion for JML) at 3; Exh. J (TranSched's Opposition to Versyss's Supp. Motion to file Supp. Br. In Supp. of Motion for JML) at 2.

However, instead of relying solely on the Complaint, Federal opted to rely on materials outside the four corners of the Complaint in support of its Rule 12(b)(6) motion. These materials include three documents not attached to the Complaint – the Policy, the Underlying Complaint and a confidential settlement communication – as well as two documents that were attached to the Complaint (the jury verdict and the Delaware court's ruling on post-trial motions and entry of judgment). Plaintiff objects to the use of any of these materials (other than the Policy) in this Rule 12(b)(6) proceeding.

As set forth in a leading treatise, this Court has "discretion to reject any extra-pleading matter if the judge feels that it is not substantial or comprehensive enough to facilitate the disposition of the action." Wright & Miller, 5C Federal Practice and Procedure: Civil (3d) § 1364 at 133. This is the course urged by TranSched, because the extraneous evidence relied on by Federal represents a highly selective smattering of the evidence bearing on the application of the Limited Contract and Deliberate Fraud Exclusions and on the bad faith issues presented in the Motion to Dismiss. As set forth in the affidavit of TranSched's counsel, there are substantial evidentiary materials that Federal omitted from its motion, that are unavailable at this time and that (if available) TranSched would file to defeat the Limited Contract and Deliberate Fraud Exclusions, including without limitation:

- Depositions taken in the Underlying Action, including (a) the deposition of Sheryl Miller setting forth her fraudulent conduct during the due diligence stage, and (b) the deposition of Lorin Miller to the same effect. These depositions are subject to a protective order and cannot be introduced without relief from the Delaware court;

- Numerous trial exhibits in the Underlying Action which are subject to protection pursuant to order of the Delaware court;

- Correspondence between Federal and Versyss including the claim tender, the reservation of rights letter, coverage positions taken by Federal, and the amounts of defense costs, which are outside the possession of TranSched and must be obtained pursuant to discovery; and

- Due diligence and other negotiation documents concerning the underlying transaction which, again, are subject to protective order in the Underlying Action.

TranSched expects these documents and materials to establish, *inter alia*, the following:

- That Ms. Miller sent TranSched a project plan for the Titan software stating that the software would be ready for beta testing within three months of closing, even though Versyss employees testified that there was "virtually no code or specifications written for Titan" as of the date of closing, let alone the time Ms. Miller made the statements. <u>See</u> Exh. I (TranSched's Opposition to Versyss's Motion for JML) at 3.

- That this fraudulent misrepresentations and others committed by Sheryl Miller and Lorin Miller occurred months prior to the drafting and execution of the APA and were independent of the representations and warranties in the APA that formed the basis for TranSched's claims for breach of contract and breach of the covenant of good faith and fair dealing;

- That TranSched would not have purchased the Versyss assets but for the fraudulent acts of Ms. Miller and Mr. Miller during due diligence. <u>See</u> Exh. I (TranSched's Opposition to Versyss Motion) at 2;

- That neither Ms. Miller nor Mr. Miller served as CEO, President, CFO, or chairman of any Versyss entity at the time of their fraudulent actions;

- That Federal acted in bad faith in denying indemnity coverage despite overwhelming evidence of their policyholders' liability;

- That Federal defended the suit in bad faith and eroded policy limits to the point that a $2 million policy (according to Federal) has insufficient remaining limits to pay the judgment of less than $700,000;

- That Federal improperly failed to accept a settlement demand within policy limits and less than the eventual judgment, and is thus liable for excess interest; and

- That TranSched, in this direct action, now stands in the shoes of Versyss and has standing to assert Versyss's excess interest and bad faith claims.

<u>See</u> Affidavit of Rickey Glover at ¶¶ 6-7. Because no discovery has taken place, and because substantial evidentiary materials from the underlying case cannot be used until relief is obtained from the protective order in the Delaware state court (Exh. L), TranSched believes that this is the appropriate option.

### D. Federal Does Not Challenge Count II, Which Sufficiently Alleges a Claim Under the "Rejected Settlement Offer" Statute

In Count II of the Complaint, TranSched asserts a claim under the "rejected settlement offer" statute, R.I. Gen. Laws § 27-7-2.2. Federal makes no argument in support of dismissal of Count II, nor could it reasonably do so. The statute provides that insurers that fail to accept pretrial settlement demands will be liable to the third-party claimant for all interest on the eventual judgment, even where the total of the judgment and all prejudgment and postjudgment interest exceeds the available policy limits. See Demarco, 26 A.3d at 617 ("The clear and straightforward language of § 27-7-2.2 indicates that it applies to '*any* civil action … in which *the plaintiff* makes a written offer to the defendant's insurer to settle the action in an amount equal to or less than the coverage limits' and said offer is rejected by the defendant's insurer.") (emphasis in original). The Complaint alleges that TranSched made pretrial settlement offers within the limits of the Federal policy that were not accepted by Federal. Accordingly, the Complaint states a colorable claim under the "rejected settlement offer" statute, and the Motion should be denied as to Count II.

### E. TranSched's Complaint Alleges Facts Sufficient to State Claims for Bad Faith, and It is Premature to Weigh the Merits of TranSched's Bad Faith Claims

Federal's final argument is that TranSched fails to adequately plead statutory and common law claims for bad faith. This argument is both premature and incorrect.

As Federal admits in its Motion to Dismiss, before the Court may consider the merits of TranSched's bad faith claims, TranSched must prove that Federal breached the terms of the Policy. See Motion to Dismiss at 15 n.4; Lewis v. Nationwide. Mut. Ins. Co., 742 A.2d 1207, 1209-10 (R.I. 2000). As such, so long as TranSched's Complaint alleges facts sufficient to

establish "plausible" claims of bad faith, weighing the merits of bad faith claims is premature. For that reason alone, Federal's Motion to Dismiss should be denied.

Federal's Motion to Dismiss the statutory and common law bad faith counts also lacks substantive merit. This can best be demonstrated by reviewing the scope and purpose of bad faith claims under Rhode Island law.

One category of bad faith claims consists of those asserted directly by the insured, asserting that the insurer violated statutory and/or common law obligations of good faith owed directly to the policyholder. Federal does not dispute that Rhode Island law recognizes such claims. See, e.g., Fraioli v. Metropolitan Prop. & Cas. Co., 748 A.2d 273 275 (R.I. 2000) (insurer owes fiduciary obligation to protect insured from excess liability against third-party claims); Asermely v. Allstate Ins. Co., 728 A.2d 461, 464 (R.I. 1999) (liability for failure to make timely offer of settlement of third-party claims).

Contrary to Federal's arguments, the Rhode Island Supreme Court has expressly recognized that a third-party claimant, standing in the shoes of that insured, can assert that the insurer violated duties of good faith owed to the insured. See Demarco, 26 A.3d at 626-27 (permitting assignment of bad faith claims from insured to third-party claimant); Mello v. General Ins. Co. of America, 525 A.2d 1304, 1306 (R.I. 1987). Although it is true that TranSched has not alleged that Versyss has contractually assigned its bad faith claims, TranSched has sufficiently stated an "in the shoes of" claim against Federal.

In addition to allowing *contractually assigned* bad faith claims to be asserted, courts around the country have implied an equitable assignment by allowing third parties to assert bad faith claims on behalf of an insured as necessary to make the third party whole. This arises most commonly in the context of equitable subrogation, in which an excess insurer aggrieved by the

failure of a primary insurer to settle within primary limits is permitted to "step into the shoes" of the primary insurer to assert bad faith claims in a direct action. See, e.g., Valentine v. Aetna, 564 F.2d 292 (9th Cir. 1977) (applying California law and allowing action under a theory of equitable subrogation); Portland General Electric v. Pacific Indemnity Co., 579 F.2d 514 (9th Cir. 1978) (same, applying Oregon law); Valentine v. Liberty Mutual, 620 F.2d 583 (6th Cir. 1980) (direct action allowed under Michigan law); Hartford Indemnity v. Michigan Mutual, 462 N.Y.S.2d 175 (1983), aff'd, 475 N.Y.S.2d 267 (1984) (direct action under New York law); Puritan Ins. Co. v. Canadian Universal Ins., 775 F.2d 76 (3rd Cir. 1985) (direct action under Pennsylvania law).

An equitable remedy of this nature is consistent with the direct action statutes, R.I. Gen. Laws §§ 27–7–1 and 27–7–2, which permit an injured party to sue a tortfeasor's liability insurer in order to obtain satisfaction of a judgment obtained against the tortfeasor. See Clauson v. New England Ins. Co., 83 F. Supp. 2d 278, 281 (D.R.I. 2000) ("in such [direct action] cases, the third party's rights against the insurer can be no greater than the rights possessed by the insured into whose shoes the third party steps"), citing Factory Mutual Liability Ins. Co. of America v. Cooper, 106 R.I. 632, 262 A.2d 370 (1970). Such a remedy also reinforces the public policies underlying the Rhode Island Supreme Court's decisions to permit third-party assignees to pursue the insured's bad faith claims in a direct action. Those policies include avoiding multiplicity of actions, see Mello, 525 A.2d at 1306 ("Rather than levy an execution against Red Bridge, who would then be required to sue General Insurance in order to recover the balance due on the judgment, Red Bridge attempted to assign to the plaintiff its right to sue General Insurance directly."), and promoting full satisfaction of final judgments. See id.

For the foregoing reasons, Federal's effort to dismiss the bad faith counts should be rejected.

## CONCLUSION

TranSched respectfully requests that the Court deny Federal's Motion to Dismiss.

Respectfully submitted,

PLAINTIFF TRANSCHED SYSTEMS LIMITED,
By its attorneys,

_____/s/ Christine K. Bush_____
Christine K. Bush, Esq. (#5587)
Eric E. Renner, Esq. (#7481)
Scott & Bush Ltd.
One Turks Head Place
Fourth Floor
Providence, RI  02903

OF COUNSEL:

_____/s/ Rickey G. Glover_____
Robert J. Gilbert (Admitted Pro Hac Vice)
Rickey G. Glover (Admitted Pro Hac Vice)
Gilbert & Renton LLC
344 North Main Street
Andover, MA 01810
(978) 475-7580 (telephone)
rgilbert@gilbertandrenton.com
rglover@gilbertandrenton.com

March 14, 2013

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of March, 2013, a true copy of the foregoing was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and copies will be mailed to those indicated as non-registered participants.

/s/ Christine K. Bush_____